UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

    v.

RAMON ROMERO,

              Defendant.

-----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
20-CR-380 (WFK)

**WILLIAM F. KUNTZ, II, United States District Judge:**

On June 10, 2024, Ramon Romero ("Defendant") pled guilty to one count of conspiracy to import cocaine contrary to 21 U.S.C. § 952 and in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B)(ii). Plea Agreement ("Plea") ¶ 1, ECF No. 84.[1]   The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a).   For the reasons set forth below, Defendant is hereby sentenced to two hundred and ten (210) months' imprisonment; five (5) years of supervised release with both the standard and special conditions of supervision; and a $100.00 mandatory special assessment.

## I.      Background

### A.      Factual Background

From approximately January 2016 until October 2020, Defendant and Saulo DePena ("DePena," together with Defendant, "Defendants") conspired to import and to distribute large amounts of cocaine from the Dominican Republic into the United States.  Presentence Investigation Report (the "PSR") ¶ 3, ECF No. 133.  Once the cocaine was in the United States, Defendants distributed it to other members of their drug trafficking organization (the "DTO"). *Id.* The cocaine was imported through one of two channels: (1) John F. Kennedy International Airport ("JFK"); and/or (2) shipping containers arriving at maritime ports. *Id.* Defendant's conduct involved both channels whereas DePena's conduct only involved the former. *See id.* ¶¶

---

[1] Citations are to the docket in *United States v. Romero*, 20-CR-380.  Page pincites refer to the ECF page numbers assigned to a filing, where available, and where no ECF heading is present, to the page numbers listed in the original filing.

3, 9 (noting DePena largely ceased participating in the conspiracy prior to the use of maritime ports in 2018). In total, Defendant is responsible for the importation of over four hundred and fifty (450) kilograms of cocaine during his involvement in the conspiracy. *Id.* ¶ 15. DePena is responsible for between one hundred and fifty (150) and four hundred and fifty (450) kilograms of cocaine. *Id.*

    1.    *JFK Scheme*

The JFK scheme relied on the participation of U.S. Customs and Border Protection ("CBP") officer Fernando Marte ("Marte"). *Id.* ¶ 4. In late 2015, Defendant approached Marte, who was assigned to Terminal 4 at JFK. *Id.* In return for money, Marte checked to see if proposed drug couriers had any immigration or travel flags and then escorted the couriers through JFK. *Id.* For each trip a courier made, DePena gave Marte a BlackBerry device to communicate with Defendants and exchange the name, photo, and flight details of drug couriers. *Id.* ¶ 5. After Marte confirmed a courier could pass through JFK without being pulled for secondary inspection, he waited in the primary inspection area for the courier's arrival and personally escorted them to the airport exit, ensuring the cocaine successfully left JFK. *Id.* Within days of a successful trip, DePena would pay Marte, give him a new BlackBerry device, and retrieve the previous BlackBerry device. *Id.* Marte was paid "several thousand dollars per kilogram of cocaine successfully smuggled through JFK. *Id.* ¶ 4.

Once a courier successfully left JFK with the cocaine, a driver for the DTO would pick the courier up and take them to an apartment to store the cocaine. *Id.* ¶ 6. DePena proceeded to sell the cocaine to other DTO members in wholesale amounts. *Id.* Because Defendant resided in the Dominican Republic for most of the conspiracy's duration, DePena regularly arranged for portions of the cocaine sale proceeds to be sent to Defendant in the Dominican Republic. *Id.*

Between January 2016 and February 2017, the DTO sent one to two drug couriers per month. *Id.* ¶ 7. At first, couriers traveled with only a few kilograms to "minimize risk of detection and apprehension[,]" but they later started traveling with "as much as a few dozen kilograms of cocaine." *Id.* The Government estimates the DTO smuggled or attempted to smuggle at least fifty (50) to one hundred and fifty (150) kilograms of cocaine during the 2016-to-2017 period of the conspiracy. *Id.*

The JFK scheme was uncovered after CBP officers seized two bags belonging to a female and male passenger traveling from the Dominican Republic on February 7, 2017. *Id.* ¶ 8. Officers found approximately forty-five (45) kilograms of cocaine in the bags. *Id.* Marte was arrested the next day for his role in the conspiracy. *Id.*

2.    *Shipping Container Scheme*

Separate from the JFK scheme—yet still within the ambit of the DTO import conspiracy—Defendant sent cocaine via shipping containers set to arrive at U.S. maritime ports. *See id.* ¶¶ 9–11. In May 2018, Defendant sent approximately two hundred and forty-seven (247) kilograms of cocaine hidden inside cardboard boxes containing tomatoes. *Id.* ¶ 9. The boxes were destined for Junior's Produce, a produce importing business in Uniondale, New York. *Id.*

CBP officials discovered the shipped cocaine when it arrived at Red Hook Port in Brooklyn, New York. *Id.* A U.S. Department of Homeland Security investigation revealed the owner of Junior's Produce agreed to receive cocaine shipments from Defendant and the DTO in return for $50,000.00 to $60,000.00 per shipment. *Id.* ¶ 10. Law enforcement determined Junior's Produce received at least two shipments of cocaine from the DTO, containing approximately ninety (90) and two hundred (200) kilograms of cocaine, respectively. *Id.*

3

In July 2019, Defendant again sent a shipment of cocaine, this time to a produce importing business named Real Produce in Philadelphia, Pennsylvania. *Id.* ¶ 11. This shipment contained approximately sixty-six (66) kilograms of cocaine, which officers intercepted at the Red Hook Port. *Id.*

### 3. *Other Relevant Conduct*

In addition to utilizing Marte's help as a CBP officer at JFK, Defendant enlisted his close friend Amaury Abreu ("Abreu")—a New York City Police Department officer—to access information from law enforcement databases to see if a member of the DTO had outstanding warrants. *Id.* ¶ 12. The purpose of accessing the information was to see if the DTO member could safely travel from New York to the Dominican Republic without being arrested. *Id.* Abreu also informed Defendant of a planned law enforcement operation, which resulted in the arrest of several rival drug trafficking members. *Id.* ¶ 13. Furthermore, Abreu received cocaine directly and sold it to others. *Id.* ¶ 14.

### 4. *Defendant's Cooperation*

After Defendant's arrest, he cooperated with a drug investigation conducted by the Government. *See* Gov't Sent'g Mem. at 3–4, ECF No. 143; Def. Sent'g Mem. at 2, ECF No. 142. Defendant "agreed to meet with the government despite the potential for grave physical harm to himself and his family[]" and "sat for two interviews with the government pursuant to the terms of a proffer agreement[.]" Gov't Sent'g Mem. at 3. Defendant provided information about co-conspirators in the DTO and details about the DTO's criminal activities. *Id.* Notwithstanding his efforts, Defendant's cooperation only revealed information the Government was already familiar with. *Id.*

4

**B.**    **Procedural Background**

On November 5, 2020, a U.S. Grand Jury returned an indictment against Defendants (the "Indictment"). ECF No. 1. The Indictment asserted two counts: Count One against Defendants alleged conspiracy to import cocaine contrary to 21 U.S.C. §§ 952(a) and 960(a)(1) in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B)(ii); and Count Two against Defendants alleged conspiracy to distribute and possess with intent to distribute cocaine contrary to 21 U.S.C. § 841(a)(1) and in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II). Indictment ¶¶ 1–2, ECF No. 1. The Indictment also raised criminal forfeiture allegations as to both counts. *Id.* ¶¶ 3–4.

On November 1, 2021, the U.S. Marshal Service extradited Defendant to the Eastern District of New York from the Southern District of Florida after Defendant's arrest on September 9, 2021. PSR ¶ 17. On September 29, 2022, Homeland Security Investigations agents extradited DePena from the Dominican Republic to the United States after his arrest on August 22, 2022. *Id.* ¶ 19.

On June 10, 2024, Defendant pled guilty to Count One of the Indictment, charging him with conspiracy to import cocaine contrary to 21 U.S.C. §§ 952(a) and 960(a)(1) in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B)(ii). Plea ¶ 1. Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposed a term of two hundred and ninety-three (293) months' imprisonment or below. *Id.* ¶ 4. Additionally, the Government agreed "no further criminal charges will be brought against [Defendant] for conspiring to import cocaine in or about and between January 2016 and October 2020, and conspiring to distribute and possess with intent to distribute cocaine in or about and between January 2016 and October 2020 as charged in the Indictment[.]" *Id.* at ¶ 5(a).

5

On October 30, 2024, DePena pled guilty to Counts One and Two of the Indictment without a written plea agreement.  Plea Penalty Sheet, ECF No. 122.  DePena's sentencing has not been set, but a presentence investigation report was filed on March 26, 2025.  ECF No. 127.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553.  Together with 18 U.S.C. § 3553, the United States Federal Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines.  18 U.S.C. § 3553(c)(2).  The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form."  *Id.*  The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)."  *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the United States Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar

conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. §

3553(a). The Court now addresses each factor in turn.

### III.    Analysis

#### A.    The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of

the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

##### 1.    *Family and Personal Background*

Defendant was born on November 2, 1986, in the Dominican Republic, to the marital

union of Nazario Romero and Ramona Jose DeRomero. PSR ¶ 41. Until he was eleven years of

age, Defendant was raised by both of his parents under low-income socioeconomic conditions in

La Vega, Dominican Republic. *Id.* ¶ 43. When he reached eleven years of age, Defendant's

parents immigrated to the United States and left him in the care of his sister Lucia Romero. *Id.*

Defendant ultimately joined his parents in the United States at the age of fourteen. *Id.*

Otherwise, Defendant reported a "generally unremarkable childhood" and he "denied

experiencing any form of abuse." *Id.*

In 2015, Defendant moved back to the Dominican Republic and remained there until he

moved back to Queens, New York, in 2017. *Id.* ¶ 47. From 2018 to Defendant's arrest, he

resided in Santiago, Dominican Republic. *Id.* At the time of his arrest, Defendant's primary

address was in the Dominican Republic. *Id.* As of September 9, 2021, Defendant is a permanent

resident of the United States. *Id.*

Defendant's father died in 2022 due to complications stemming from old age. *Id.* ¶ 41.

His mother—now eighty-three years of age—resides in Hempstead, New York, and suffers from

asthma and age-related health issues. *Id.* Defendant reported a close relationship with his

7

mother, sharing they communicate with each other weekly. *Id.* Defendant's mother is aware of the instant case and remains supportive. *Id.*

Defendant has six siblings, all of whom were born to the marital union of his parents. *Id.* ¶ 42. Balerio Romero, fifty-seven years of age, resides in Allentown, Pennsylvania, and works as a meat packer. *Id.* Lucia Romero, fifty-four years of age, resides in Hempstead, New York, and works as a cleaner. *Id.* Roberto Romero, fifty-two years of age, also resides in Hempstead and works at Walmart. *Id.* Miguel Romero, forty-eight years of age, resides in Hempstead and works at a restaurant. *Id.* Jesus Romero, forty-five years of age, resides in Freeport, New York, and works as a bus driver. *Id.* Vincente Romero, forty-one years of age, resides in Central Islip, New York, and works as a manager for a cigarette distribution company. *Id.* Defendant has a close relationship with all his siblings and they "communicate as often as he is able." *Id.* All Defendant's siblings are aware of the instant case and remain supportive. *Id.*

In 2009, Defendant entered a romantic relationship with Yesenia Delacruz, who is now forty-two years of age. *Id.* ¶ 44. She resides in Uniondale, New York, is healthy, and is employed as a childcare provider. *Id.* Defendant and Ms. Delacruz have a daughter named Jade Romero, who is twelve years of age. *Id.* Jade Romero lives with her mother, is enrolled in school, and is healthy. *Id.* Defendant and Ms. Delacruz broke up in 2012 due to his reported infidelity. *Id.* However, prior to his arrest, Defendant provided financial support to Ms. Delacruz on an as-needed basis and saw his daughter two to three times per year. *Id.* Between 2017 and 2018, Defendant's daughter lived with him. *Id.* Defendant stated Ms. Delacruz is struggling without his financial assistance. *Id.* Ms. Delacruz is aware of the instant case and remains supportive. *Id.* It is unclear whether Defendant's daughter is aware of the instant case. *See generally* PSR.

Since 2014, Defendant maintains an intermittent romantic relationship with Annmarie Chavez, who is thirty-six years of age. *Id.* ¶ 45. She resides in Baldwin, New York, is healthy, and is employed as an account executive. *Id.* Ms. Chavez described Defendant as a "good father and person," reporting she was shocked by the news of Defendant's arrest. *Id.* Ms. Chavez is aware of the instant case and remains supportive. *Id.* Ms. Chavez requested leniency from this Court on Defendant's behalf. *Id.*

Defendant and Ms. Chavez have a son named Amir Romero, ten years of age, who resides with Ms. Chavez. *Id.* Defendant and Ms. Chavez were separated at the time of his son's birth, and Defendant had limited visitation rights immediately prior to his incarceration. *Id.* Defendant saw his son once when he was five days old, and again when his son was three months old and vacationing in the Dominican Republic. *Id.* After the vacation, Defendant did not see his son for two years. In 2017, Defendant returned to the United States and visited his son weekly until 2018, when Defendant moved back to the Dominican Republic. *Id.* Defendant did not see his son for another five years. *Id.* Prior to Defendant's arrest, he financially supported his son on an as-needed basis. *Id.* It is unclear whether Defendant's son is aware of the instant case. *See generally* PSR.

Defendant represented he will be deported due to his conviction in this case. *See* Def. Sent'g Mem. at 3. U.S. Immigration and Customs Enforcement records note Defendant "may be amenable to removal proceeding[s] if convicted for a felony offense." PSR ¶ 47.

2.    *Educational and Employment History*

From October 12, 2001, to October 5, 2005, Defendant attended Hempstead High School in Hempstead, New York. *Id.* ¶ 57. Defendant reported withdrawing from school in the tenth grade due to his "growing disinterest in school." *Id.* Defendant's "scholastic standing,

attendance, behavior, and cooperativeness were in poor standing during his admission [at Hempstead High School]." *Id.* On July 5, 2023, Defendant obtained a certificate in general education development while in custody at the Metropolitan Detention Center, Brooklyn (the "MDC"). *Id.* ¶ 56.

Defendant is a fluent Spanish speaker. *Id.* ¶ 58. His ability to speak and understand English is limited. *Id.*

Between 2010 and 2011, Defendant owned Alfa Lounge in Freeport, New York. *Id.* ¶ 61. Between 2015 and 2017, Defendant was intermittently employed as an independent farmer in the Dominican Republic. *Id.* Between 2018 and 2021, Defendant worked as a full-time independent farmer in the Dominican Republic, reporting varied earnings. *Id.* ¶ 60. Defendant did not report any other employment history and declined to discuss how he supported himself financially during periods of unemployment. *Id.* ¶ 62. Defendant currently appears unable to pay a fine. *Id.* ¶ 67.

### 3. *Prior Convictions*

Defendant has one prior conviction for driving while his ability was impaired by the consumption of alcohol, which qualifies as an infraction under New York State law. *Id.* ¶ 34. After observing Defendant illegally parked, police conducted a traffic stop. *Id.* While stopped, police smelled a "strong odor of alcohol emanating from [Defendant's] mouth and observed that his eyes appeared glassy." *Id.* Defendant also "fumbled through his wallet" while stopped, indicating impaired motor skills. *Id.* The subsequent arrest and conviction arose from Defendant "pull[ing] away [from the police officers] at a high rate of speed of 50 miles per hour . . . in a 30 MPH zone." *Id.* A blood alcohol content test returned a level of 0.10%. *Id.*

Defendant was arrested for this offense on May 13, 2010, when he was twenty-three years of age.  On May 17, 2010, the Nassau County 1st District Court conditionally discharged Defendant, imposed a $300 fine, and suspended Defendant's driver's license for ninety days.  *Id.*

### 4.    *Physical and Mental Health*

Defendant is healthy and has no history of serious or chronic health issues.  *Id.* ¶ 50.  He is not receiving any medications or medical treatment at the MDC.  *Id.*  Similarly, Defendant has no history of mental or emotional health problems nor treatment for such problems.  *Id.* ¶ 51. Nor does Defendant report a history of gambling or suicidal ideation.  *Id.*

### 5.    *Substance Abuse*

Defendant first consumed alcohol when he was thirteen years of age and he reported he last drank alcohol in September 2021.  *Id.* ¶ 52.  Defendant emphasized he was strictly a social drinker.  *Id.*

When Defendant was eighteen years of age, he began smoking marijuana.  *Id.* ¶ 53. Defendant's last use of marijuana was in July 2021 when he engaged with it socially a "few times[.]"  *Id.*

When Defendant was thirty years of age, he began using Percocet.  *Id.* ¶ 54.  Defendant reported using Percocet socially a "few times[,]" but cannot remember when he last consumed it. *Id.*

Defendant reported achieving sobriety on his own and does not believe he needs a substance abuse treatment program.  *Id.* ¶ 55.

### 6.    *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense.  *See supra* Part I.

11

## B.    The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. Defendant engaged in a multi-year conspiracy to import into the United States substantial amounts of cocaine. *See* PSR ¶¶ 3–15. Defendant played a significant role in the scheme, while organizing the DTO's activities. *Id.* ¶ 3. The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a).

## C.    The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3). Defendant pled guilty to one count of conspiracy to import cocaine contrary to 21 U.S.C. § 952 and in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B)(ii). Plea ¶ 1.

Defendant faces a maximum term of life imprisonment and a minimum term of ten (10) years' imprisonment. 21 U.S.C. 960(b)(1). Defendant also faces a maximum term of lifetime supervised release and a minimum term of five (5) years of supervised release. *Id.* If a condition of release is violated, Defendant may be sentenced to up to three (3) years of imprisonment

12

without credit for pre-release imprisonment or time previously served on post-release supervision. 18 U.S.C. §§ 3583(e). Defendant is ineligible for a term of probation. 21 U.S.C. 960(b)(1).

In addition to facing terms of imprisonment and supervised release, Defendant faces a maximum fine of $10,000,000.00. *Id.* The Court is also required to impose a mandatory special assessment of $100.00 per count pursuant to 18 U.S.C. § 3013(a)(2)(A).

### D.    The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." *Id.* § 3553(a)(4)(A).

The U.S. Probation Office ("Probation") and the Government agree as to which general Guideline provision applies here. U.S.S.G. § 2D1.1 covers numerous offenses involving drugs. *See* PSR ¶ 23; Gov't Sent'g Mem. at 2; U.S.S.G. § 2D1.1 (covering unlawful manufacturing, importing, exporting, or trafficking of drugs, including attempt or conspiracy).

However, Probation and the Government differ as to which Base Offense Level under U.S.S.G. § 2D1.1 applies. Probation believes the appropriate Base Offense Level is 38 pursuant to the Drug Quantity Table which provides for a Base Offense Level of 38 where the offense involved 450 kilograms or more of cocaine. PSR ¶ 23; U.S.S.G. § 2D1.1(c)(1). The Government does not disagree with Probation's conclusion on the Base Offense Level, Gov't Sent'g Mem. at 3, but notably "submits that the Guidelines range estimated in the [Plea] of 210 to 262 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing[,]" *id.* Despite agreeing Defendant "is responsible for importing at least 450 kilograms of cocaine on behalf of the DTO throughout the charged time period[,]" *id.* at 3 n.1,

13

the Government believes a Base Offense Level of 36—as calculated in the Plea—should be applied instead, *id.* at 3. Defendant's sentencing memorandum did not provide a Guidelines calculation, although the Plea takes the Government's position. *See generally* Def. Sent'g Mem; Plea ¶ 2.

Otherwise, Probation and the Government agree as to which adjustments should apply to Defendant's Base Offense Level. First, Probation and the Government agree U.S.S.G. § 3B1.1(a)[2] adds 4 levels because Defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" U.S.S.G. § 3B1.1(a). *See* PSR ¶ 26; Gov't Sent'g Mem. at 2. Although Defendant does not provide a Guidelines calculation, he does appear to object to the application of this enhancement. Specifically, Defendant "denies being the 'boss'" and "denies that any of the participants [in the conspiracy] would be other than partners without any particular partner being in charge." Def. Sent'g Mem. at 1. According to Defendant, the conspiracy "was one of equal partners." *Id.* at 2. Notably, the Plea Defendant signed also states this Guideline provision applies. Plea ¶ 2.

Finally, Probation and the Government agree certain reductions apply for Defendant's timely acceptance of responsibility under U.S.S.G. §§ 3E1.1(a)–(b). *See* PSR ¶¶ 29–30; Gov't Sent'g Mem. at 2. Namely, 3 levels are subtracted because Defendant demonstrated acceptance of responsibility for his offense and did so in a timely fashion. Defendant again did not provide a Guidelines calculation indicating his position on these reductions. *See generally* Def. Sent'g Mem.

---

[2] The Government seems to erroneously cite to U.S.S.G. § 3B1.1(c) which only provides for a 2-point enhancement, given its sentencing memorandum notes a 4-point enhancement applies. *See* Gov't Sent'g Mem. at 2.

14

Because Probation and the Government disagree as to the applicable Base Offense Level, they arrive at different calculations for the applicable Total Adjusted Offense Level. Probation calculates Defendant's Total Adjusted Offense Level to be 39. PSR ¶ 32. The Government calculates the Total Adjusted Offense Level to be 37. Gov't Sent'g Mem. at 2. Defendant did not calculate a Total Adjusted Offense Level. *See generally* Def. Sent'g Mem. However, if the aggravated role enhancement under U.S.S.G. § 3B1.1(a) does not apply—as Defendant argues— then Probation's and the Government's Total Adjusted Offense Levels decrease by 4 levels to 35 and 33, respectively.

Probation and the Government agree Defendant's Criminal History Category is I because he has the one conviction on a New York State infraction for driving while his ability was impaired by the consumption of alcohol. *See* PSR ¶ 34; Gov't Sent'g Mem. at 2; U.S.S.G. §§ 4A1.1(c), (e)(2). Defendant did not provide a calculation of his Criminal History Category. *See generally* Def. Sent'g Mem.

Pursuant to the Guidelines Sentencing Table, Probation's calculated Total Adjusted Offense Level of 39 and a Criminal History Category of I results in a Guidelines range of two hundred and sixty-two (262) to three hundred and twenty-seven (327) months' imprisonment. *See* U.S.S.G. § 5A. The Government's calculated Total Adjusted Offense Level of 37 and a Criminal History Category of I results in a Guidelines range of two hundred and ten (210) to two hundred and sixty-two (262) months' imprisonment. *See id.* A Total Adjusted Offense Level of 35—assuming the aggravated role enhancement under U.S.S.G. § 3B1.1(a) does not apply, as Defendant argues—combined with a Criminal History Category of I results in a Guidelines range of one hundred and sixty-eight (168) to two hundred and ten (210) months' imprisonment. *See id.* A Total Adjusted Offense Level of 33—assuming the aggravated role enhancement under

15

U.S.S.G. § 3B1.1(a) does not apply—combined with a Criminal History Category of I results in a Guidelines range of one hundred and thirty-five (135) to one hundred and sixty-eight (168) months' imprisonment. *See id.*

### E.    Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5). The parties have not drawn the Court's attention to any applicable policy statements. Finding none on its own, the Court proceeds to the next § 3553(a) factor.

### F.    The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

The parties have not raised any arguments about unwarranted sentencing disparities in this case. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G.    The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Restitution is not applicable in this case. 18 U.S.C. § 3663.

## IV.    Conclusion

For the reasons set forth above, the Court sentences Defendant to two hundred and ten (210) months' imprisonment; five (5) years of supervised release with both the standard and special conditions of supervision; and a $100.00 mandatory special assessment. This sentence is

sufficient, but not greater than necessary to accomplish the purposes of § 3553(a)(2).  The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the Presentence Investigation Report, as corrected herein, to the extent those findings are not inconsistent with this opinion.  The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

SO ORDERED.

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: April 22, 2026
        Brooklyn, New York